845 A.2d 1265 (2004)
368 N.J. Super. 311
Shedrack SKEETE, Plaintiff-Appellant,
v.
Chaisner DORVIUS, Louise Taylor, Queenie W. Thomas, John Does 1-3 (fictitious person/entity), Richard Roe 1-3 (fictitious person/entity), and ABC Insurance Company (fictitious person/entity), Defendants, and
Prudential Insurance Company, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued March 16, 2004.
Decided April 6, 2004.
*1266 Martin H. Cowen, Newark, argued the cause for appellant (Slavitt & Cowen, attorneys; Ronald G. Schecter, on the brief).
John M. Kearney argued the cause for respondent (Sellar Richardson, attorneys; Mr. Kearney and Jill Roth, on the brief).
Before Judges ALLEY, PARKER and R.B. COLEMAN.[1]
The opinion of the court was delivered by PARKER, J.A.D.
This case involves an auto insurance policy issued by Prudential Insurance Company (Prudential) and subsequently amended to include a step-down in uninsured/underinsured motorists (UM/UIM) coverage. Plaintiff and Prudential cross-moved for summary judgment on the UIM coverage issue. Plaintiff's motion was denied and Prudential's motion was granted dismissing plaintiff's claim. We reverse and remand.
On June 5, 2000, plaintiff was a passenger in a vehicle owned and operated by Queenie Thomas and insured by Prudential. Thomas' vehicle was struck by a vehicle owned and operated by defendant Chaisner Dorvius. Plaintiff, who was seriously injured, instituted suit against Dorvius, which was tried to a jury on the issue of liability. The jury rendered a verdict in favor of plaintiff, but Dorvius' insurance policy was limited to $25,000/$50,000. The Dorvius policy was insufficient to cover plaintiff's injuries and plaintiff settled for the policy amount with notice to and authorization from Prudential.
Plaintiff did not own a motor vehicle, have auto insurance, reside with Thomas or in a household where any member had auto insurance coverage. Plaintiff, therefore, was entitled to Personal Injury Protection (PIP) and UIM coverage through Thomas' Prudential policy. Prudential paid certain medical bills under the PIP coverage in Thomas' policy, but declined to honor plaintiff's claim for UIM benefits.
When the complaint was dismissed, plaintiff appealed, arguing (1) the doctrine of reasonable expectations mandates coverage in the amount of $100,000/$300,000; and (2) the UM/UIM step-down provision should be set aside because Prudential did not act in good faith and fair dealing in notifying Thomas of the policy change. Defendant responds, arguing that (1) there is no ambiguity in the step-down provision; *1267 and (2) Prudential complied with all regulations in notifying Thomas of the policy changes.
Thomas initially obtained the Prudential policy in June 1997. She specifically elected UM/UIM coverage in the amount of $100,000/$300,000, and paid an additional premium of $23 for it. On her application for the policy, she stated "there are no additional driver or non-driver relatives living with me. I am the only person at home." At six-month intervals, Thomas received policy renewals with the same UM/UIM coverage shown on the declaration page.
On May 25, 1999, Thomas received two packages of material from Prudential. The first package of eighty-three pages advised of changes in the policy as a result of the Auto Insurance Cost Reduction Act of 1998 (AICRA), N.J.S.A. 39:6A-1.1. The second package, also dated May 25, 1999, contained another thirty pages of material. The 113 pages in the two May 25 packages included a New Standard Auto Policy Booklet Parts 1, 2, 3, 4, a separate Part 5, a renewal declaration page, a bill, insurance identification cards, Notice of Policy Changes, PIP Pre-Certification Requirements, Endorsements PAC 4220 and PAC 236, standard coverage selection forms, a Buyer's Guide, and Rating Information Form. A cover letter included with the May 25, 1999 materials stated:
This renewal offer includes important policy changes and the rate reduction mandated by the 1998 Automobile Cost Reduction Act.... Significant changes have been made to your policy. We have enclosed an Important Notice to New Jersey policy holders which highlights the changes and how they will affect your policy. We have also included a detailed summary of the Personal Injury Protection (PIP) pre-certification requirements under your Prudential automobile policy. We urge you to carefully read these important notices, along with your policy booklets for a complete examination of the changes.
The declaration page in the eighty-three page package stated coverage, limits and premiums:

Uninsured Motorists-Bodily Injury
Each Person $100,000
Each Accident $300,000

The premium was $21 for that coverage, a $2 reduction consistent with the notice that the policy was being re-rated as required by AICRA.
In Part 4, page 22, of the New Standard Policy Booklet was the first mention of the step-down in UM/UIM coverage. The section stated:
PART 4 UNINSURED/UNDERINSURED MOTORISTS COVERAGE:
If you've paid for this coverage, we will pay up to our limit of our liability shown on the Declarations for Uninsured Motorists Coverage and Underinsured Motorists Coverage for bodily injury that a Named Insured or Resident Relative is legally entitled to recover from an uninsured motor vehicle or underinsured motor vehicle as described below.
A Resident Relative who is a named insured on a Basic Auto Policy is not eligible to recover Uninsured or Underinsured Motorist benefits under this policy. Additional Insureds as described in this part are also covered, but only up to a limit of $15,000 per person/$30,000 per occurrence. Coverage is subject to the Uninsured and Underinsured Motor Vehicle definitions.
Coverage is subject to the Uninsured and Underinsured Motor Vehicle definitions.
....
Underinsured Motor Vehicle means the following:
1. With respect to an insured who:

*1268 Is not the named insured under this policy; and
Is a named insured under one or more other policies providing similar coverage;
underinsured motor vehicle means a land motor vehicle or trailer of any type to which a liability bond or policy applies at the time of the accident but its limit for liability is less than the highest applicable limit of liability under any insurance providing coverage to that insured as a named insured.
2. With respect to an insured who:
Is not the named insured under this policy or any other policy; and Is insured as a spouse or family member under one or more other policies providing similar coverage; underinsured motor vehicle means a land motor vehicle or trailer of any type to which a liability bond or policy applies at the time of the accident but its limit for liability is less than the highest applicable limit of liability under any insurance providing coverage to that insured as a spouse or family member.
3. With respect to any other insured not described in Paragraphs 1. or 2. above, underinsured motor vehicle means a land motor vehicle or trailer of any type to which a liability bond or policy applies at the time of the accident but its limit for liability is less than the limit of liability for this coverage.
Part 4 also contained a section addressing the settlement of claims. In relevant part, the section states:
HOW WE'LL SETTLE A CLAIM (PART 4)
....
Limit of CoverageBodily Injury: Each Person
The amount shown on the Declarations page under Uninsured Motorists Bodily InjuryEach Person is the maximum limit of liability for all damages, including damages for care or loss of services, arising out of Bodily Injury to one Insured injured as a result of any one accident. However, if you are an Additional Insured as defined under this part, the maximum liability for Each Person is $15,000.
The eighty-three page package of material also included Endorsement PCD 3523, entitled "Attention New Jersey Automobile Policy Holders, Important Notice About Policy Changes." This notice outlined several changes in the policy as a result of AICRA and stated in relevant part:
[To the] Uninsured/Underinsured Motorists Coverage section of your policy we have added a clause which serves to limit the amount recoverable under these coverages to $15,000 per person, $30,000 per occurrence for persons who are not named insureds or resident relatives, but who are injured while passengers in your car.
In addition to the total of 113 pages Thomas received on May 25, on June 9, 1999, she received another package of seventy-eight pages re-rating her policy in accordance with AICRA. The June 9 cover letter stated:
Please note that this endorsement changes your policy, rates, and coverages mid-term, as you requested. By copy of this endorsement, you acknowledge receipt of your new policy forms PAC 186SNJ and PAC 190NJ. It is understood that your prior coverages terminate as of the effective date of this new policy and that this new policy supersedes all coverages you had under your prior policy.
The June 9 package also included the New Standard Automobile Policy booklets, an amended declarations page *1269 and Important Notice to New Jersey Policyholders, highlighting policy changes. The amended declaration page, however, listed the coverage for Uninsured Motorists as $100,000 for each person and $300,000 for each accident with no notation of the step-down in coverage. Thus, there were only a few paragraphs addressing the amended UM/UIM coverage buried in the almost 200 pages of material sent to Thomas in a two-week period of time. In our view, that is inadequate notice of a significant change in coverage.
On May 25, 2000, Thomas received another extensive renewal package containing the same declaration page included in the 1999 renewal, stating that Uninsured Motorists Coverage was $100,000/$300,000 for $21 additional premium. Again, buried in Part 4 of the Standard Automobile Policy was the same language contained in the 1999 policy.
We have considered the extensive record before us in light of the applicable law, and we are satisfied that the manner in which Prudential notified Thomas of the change in UM/UIM coverageinundating her with almost 200 pages of documents in a two-week period, burying the change in a few unremarkable paragraphs, and failing to note the change on the declaration pagewas inadequate for the average policyholder to determine that the UM/UIM coverage was amended and how the amendment would affect the policyholder.
"A personal automobile insurance policy is a bulky document, arcane and abstruse in the extreme to the uninitiated, unversed and, therefore, typical policyholder." Lehrhoff v. Aetna Cas. & Sur. Co., 271 N.J.Super. 340, 346, 638 A.2d 889 (App.Div.1994). The "conscientious policyholder ... would likely examine the declaration page to assure himself that the coverages and their amounts, the identity of the insured vehicle, and the other basic information appearing thereon are accurate and in accord with his understandings of what he is purchasing." Id. at 346-47, 638 A.2d 889.
[I]t is the declaration page, the one page of the policy tailored to the particular insured and not merely boilerplate, which must be deemed to define coverage and the insured's expectation of coverage.... [The] reasonable expectations of coverage raised by the declaration page cannot be contradicted by the policy's boilerplate unless the declaration page itself clearly so warns the insured.
[Id. at 347, 638 A.2d 889.]
The declaration page in each package clearly stated that UM/UIM coverage remained at $100,000/$300,000. The almost 200 pages of material sent to Thomas in 1999 focused extensively on the changes in PIP coverage and the pre-certification requirement mandated under AICRA. The amended UM/UIM provisions were literally buried in the materials. In our view, it is neither unreasonable nor costprohibitive for an insurance carrier to highlight specific changes in coverage particularly those resulting in a step-down of coverageon the declaration page of the policy. It is insufficient for the carrier to simply state in a cover letter that policy changes are enclosed without specifically highlighting those changes on the declaration page.
"When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded `to the full extent that any fair interpretation will allow.'" Kievit v. Loyal Prot. Life Ins. Co., 34 N.J. 475, 482, 170 A.2d 22 (1961) (citations omitted). "[R]easonable expectations will, in appropriate circumstances, prevail over policy *1270 language to the contrary." Lehrhoff, supra, 271 N.J.Super. at 347, 638 A.2d 889. Nothing in the declaration pages sent to Thomas on May 25 and June 9, 1999, and May 25, 2000, gives notice of the change in UM/UIM coverage. The reduction in the UM/UIM premium from $23 in 1997 and 1998 to $21 in 1999 and 2000 is consistent with the cover letter indicating that rates were being reduced in accordance with AICRA. The reduction in premium, therefore, would not have put the policyholder on notice that coverage had been stepped down. Moreover, the amended provision first appeared in Part 4, page 22, of the four-part Standard Automobile Policy, making it likely that only the most dedicated reader would discover it.
We are unpersuaded by Prudential's argument that it acted in good faith and fair dealing in notifying Thomas of the change. The mere statement that the package of materials contained an "Important Notice About Policy Changes," is inadequate under the circumstances where the principal focus of the changes was PIP coverage and the pre-certification requirement. Prudential maintains that it provided a tollfree telephone number and advised policyholders to call regarding questions about coverage. The problem here is that the policyholder could not even ask questions about changes in UM/UIM coverage without significant detective work.
We are similarly unimpressed by Prudential's claim that it complied with N.J.A.C. 11:3-15.1 to -15.7, Standards For Written Notice: Buyer's Guide and Coverage Selection Form. The Administrative Code, by its own terms, defines minimum standards for the Buyer's Guide and Coverage Selection Form. N.J.A.C. 11:3-15.6. The code does not address a standard for the declaration page.
We hold that unless specific changes in the limits of coverage are noted on the declaration page, the carrier's notice of changes in coverage is inadequate.
[I]n enforcing an insurance policy, courts will depart from the literal text and interpret it in accordance with the insured's understanding, even when that understanding contradicts the insurer's intent, if the text appears overly technical or contains hidden pitfalls, cannot be understood without employing subtle or legalistic distinctions, is obscured by fine print, or requires strenuous study to comprehend.
[Zacarias v. Allstate Ins. Co., 168 N.J. 590, 601, 775 A.2d 1262 (2001) (citations omitted).]
In order to detect the amended stepdown UM/UIM coverage, Thomas would have had to wade through the almost 200 pages of material she received in 1999, compared the policy page by page with the previous policy and cross-referenced the definitions of "Insured," "Named Insured," "Additional Insured," and "Resident Relative."
In reviewing the documents provided to Thomas, we are persuaded that the policyholder would reasonably expect that the coverage shown on the declaration page remained the same as the previous year. It is unlikely that the average policyholder would have identified the step-down in UM/UIM coverage without extensive detective work, an unreasonable encumbrance on a policyholder that can only result in hidden pitfalls such as are presented here.
The summary judgment dismissing the complaint is reversed. We remand the case to the trial court for prior proceedings consistent with this opinion.
NOTES
[1] Judge Coleman did not participate in oral argument. However, the parties consented to his participation in the decision.